# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| Voltage Holdings, LLC; Voltage Pictures, LLC; After Productions, LLC; After II Movie, LLC; After We Fell Productions, LTD; Venice PI, LLC; Bedeviled LLC; Colossal Movie Productions, LLC; Dallas Buyers Club, LLC; YAR Productions Inc.; Wonder One, LLC; REP PRODUCTIONS 12 LTD; Fun Mom Dinner, LLC; Chase Film Nevada LLC; H Films, Inc.; Ammo Entertainment, LLC; SF Film, LLC; MON, LLC; Goldenrod Holdings, LLC; and Rep Productions Scandi Ltd. | Case No. |

                    Plaintiffs,
          v.

AT&T Inc.
                    Defendant.

## COMPLAINT FOR COPYRIGHT INFRINGEMENT AND DMCA VIOLATIONS AND DEMAND FOR JURY TRIAL

## Table of Contents

INTRODUCTION ............................................................................................................. 1

NATURE OF THE ACTION ......................................................................................... 2

PARTIES ........................................................................................................................ 2

JURISDICTION AND VENUE ..................................................................................... 4

FACTS ............................................................................................................................ 5

A.     Plaintiffs own the copyrights to the motion pictures. .......................................... 5

B.     Third parties directly infringed Plaintiffs' copyrighted works using AT&T's internet services. ................................................................................................ 7

        1.    The BitTorrent process. .................................................................................. 7

        2.    Torrent files and torrent sites. ....................................................................... 8

        3.    AT&T users reproduced, distributed, publicly displayed, and publicly performed Plaintiffs' Works using BitTorrent. ........................................... 8

C.     AT&T knowingly materially contributed to its users' copyright infringements. ............ 10

        1.    AT&T knew, had reason to know, or was willfully blind to, its users' direct infringements of Plaintiff's Works. ................................................... 10

        2.    Despite knowledge of specific infringements, AT&T continued to provide infringing accounts with services essential to infringement. .................... 13

D.     AT&T vicariously infringed Plaintiff's Works. ................................................. 15

        1.    AT&T had the right and ability to supervise and control third parties' infringements. ............................................................................................. 15

        2.    AT&T profits from facilitating online piracy. ............................................. 16

E.     AT&T does not have a safe harbor from liability. ............................................. 17

        1.    AT&T's published policy did not provide for the termination of repeat infringers under appropriate circumstances. ................................................ 17

        2.    AT&T did not reasonably implement a policy that provided for the termination of repeat infringers under appropriate circumstances. ............. 17

F.     AT&T users distributed copies of Plaintiffs' Works with false or altered copyright management information. ....................................................................... 18

        1.    The distributed files contained false or altered copyright management information. ................................................................................................ 18

2.   AT&T users knew, had reason to know, or were willfully blind to the fact, that the copyright management information was false or altered.................................... 19

3.   AT&T users knew, had reason to know, or were willfully blind to the fact, that their acts would induce, facilitate, or enable copyright infringement. ..................... 21

G.   AT&T materially contributed to third parties' use of false or altered copyright management information. .................................................................................. 22

1.   AT&T knew, had reason to know, or was willfully blind to its users' DMCA violations........................................................................................................ 22

2.   Despite knowledge of these violations, AT&T continued to facilitate the violations........................................................................................................ 23

H.   AT&T vicariously committed DMCA violations. ............................................ 24

1.   AT&T had the right and ability to supervise and control third parties' DMCA violations........................................................................................................ 24

2.   AT&T profits from third parties' violations. ................................................. 24

FIRST CAUSE OF ACTION ...................................................................................... 24

SECOND CAUSE OF ACTION .................................................................................. 26

THIRD CAUSE OF ACTION ...................................................................................... 26

FOURTH CAUSE OF ACTION .................................................................................. 28

PRAYER FOR RELIEF .............................................................................................. 28

**INTRODUCTION**

1.      AT&T is one of the largest internet service providers in the United States, providing high-speed internet service to subscribers for a regular subscription fee.  For years, AT&T has knowingly allowed AT&T users to engage in online piracy, the illegal distribution and downloading of copyrighted materials, including films.  AT&T provides the IP addresses used for piracy, makes the connections needed to share and download pirated films, and transmits the pirated films.

2.      AT&T knows that it is facilitating mass online piracy.  Copyright owners have repeatedly told AT&T that its services are used for piracy.  Voltage and its affiliates—the producers and copyright owners of movies like *Dallas Buyers Club* and *I Feel Pretty*—have sent AT&T more than one hundred thousand infringement notices.  In the last few years alone, AT&T users have pirated Voltage's movies over six hundred thousand times.

3.      Online piracy hurts the producers of creative works, as well as the nation's economy.  The US Chamber of Commerce estimated that online piracy costs the US economy over 200,000 jobs, and over $30 billion, a year.

4.      AT&T can easily take action against online piracy.  AT&T can stop providing internet services to a customer at any time.  It can stop providing internet services to customer accounts that repeatedly use its services for piracy.  And AT&T doesn't have to find these repeat offenders itself—copyright holders like Voltage already do that for AT&T, by sending copyright infringement notices.  But AT&T does not take this simple step.

5.      That's because online piracy is lucrative for AT&T.  AT&T profits from subscriptions to its internet services.  Instead of taking simple steps against illegal pirating, AT&T turns a blind eye and continues to collect its customers' subscription payments every

1

month.  By not terminating and continuing to accept monthly payments from pirate accounts, AT&T earns an estimated $400 to $1,000 in additional profits per average pirate account, which adds tens of millions of dollars to AT&T's bottom line.

6.      But the law does not allow AT&T to enable—and profit from—online piracy. When an internet service provider like AT&T knows that its services are repeatedly used for illegal piracy that it can easily stop and yet it continues to facilitate this piracy for its own gain, the internet service provider is liable under federal law for the piracy.  This action seeks to hold AT&T accountable for the mass film piracy that it enables.

## NATURE OF THE ACTION

7.      This matter arises under the United States Copyright Act of 1976, as amended (the "Copyright Act"). 17 U.S.C. §§ 101, *et seq*.

8.      Defendant is secondarily liable for copyright infringements in violation of sections 106 and 501 of the Copyright Act, and violations of section 1202 of the Digital Millennium Copyright Act ("DMCA").  17 U.S.C. §1202.

## PARTIES

9.      Plaintiffs are owners of the motion pictures at issue in this litigation.  Plaintiffs' motion pictures are currently available for sale online and in brick and mortar retail locations. These motion pictures include *Dallas Buyers Club* and *I Feel Pretty*.  Many of these motion pictures were released in theaters throughout the world and feature actors such as Matthew McConaughey, Jared Leto, Jennifer Garner, Amy Schumer, Michelle Williams, and Zac Efron.

10.     Plaintiff Voltage Pictures, LLC ("Voltage") is a limited liability company formed in California, with its principal place of business in Los Angeles, California.  Each of the other Plaintiffs is affiliated with Voltage.

11.   Plaintiff Voltage Holdings, LLC is a limited liability company formed in Nevada.

12.   Plaintiff After Productions, LLC is a limited liability company formed in California.

13.   Plaintiff After II Movie, LLC is a limited liability company formed in Nevada.

14.   Plaintiff After We Fell Productions, LTD is a legal entity formed in the United Kingdom.

15.   Plaintiff Venice PI, LLC is a limited liability company formed in California.

16.   Plaintiff Bedeviled LLC is a limited liability company formed in California.

17.   Plaintiff Colossal Movie Productions, LLC is a limited liability company formed in California.

18.   Plaintiff Dallas Buyers Club, LLC is a limited liability company formed in Texas.

19.   Plaintiff YAR Productions Inc. is a corporation formed in New York.

20.   Plaintiff Wonder One, LLC is a limited liability company formed in Wyoming.

21.   Plaintiff REP PRODUCTIONS 12 LTD is a corporation formed in the United Kingdom.

22.   Plaintiff Fun Mom Dinner, LLC is a limited liability company formed in Delaware.

23.   Plaintiff Chase Film Nevada LLC is a limited liability company formed in Nevada.

24.   Plaintiff H Films, Inc. is a corporation formed in California.

25.   Plaintiff Ammo Entertainment, LLC is a limited liability company formed in California.

26.   Plaintiff SF Film, LLC is a limited liability company formed in New York.

3

27.     Plaintiff MON, LLC is a limited liability company formed in California.

28.     Plaintiff Goldenrod Holdings, LLC is a limited liability company formed in Nevada.

29.     Plaintiff Rep Productions Scandi Ltd is a legal entity formed in the United Kingdom.

30.     Defendant AT&T Inc. ("AT&T") is a telecommunications company incorporated in Delaware, with its principal place of business in Dallas, Texas.  AT&T is one of the largest providers of high-speed internet services in the United States.  AT&T may be served with process through its registered agent, CT Corporation System, 1999 Bryan St., Set. 900, Dallas, TX 75201-3136.

31.     AT&T provides wireless service under brand names such as AT&T Wireless.

32.     AT&T provides internet service under brand names such as AT&T U-verse.

**JURISDICTION AND VENUE**

33.     This is a civil action arising under the United States Copyright Act of 1976.  17 U.S.C. §§ 101, et seq.  This court therefore has subject matter jurisdiction over this action.  28 U.S.C. §1338.

34.     This court has personal jurisdiction over Defendant in this judicial district. Defendant's principal place of business is in Dallas, Texas, in the Northern District of Texas.

35.     Venue is proper in this district under section 1400 of the United States Code, because Defendant or Defendant's agents reside and may be found in this district.  28 U.S.C. §1400(a).

## FACTS

**A.    Plaintiffs own the copyrights to the motion pictures.**

36.    Plaintiffs are the legal and/or beneficial owners of copyrights, including, but not limited to, the rights to reproduce, distribute, publicly display, publicly perform, and prepare derivative works, in the following motion pictures:

37.    Plaintiff After Productions, LLC is a beneficial and actual owner of copyrights in the motion picture *After*.

38.    Plaintiff After II Movie, LLC is a beneficial and actual owner of copyrights in the motion picture *After We Collided.*

39.    Plaintiff After We Fell Productions, LTD is a beneficial and actual owner of copyrights in the motion picture *After We Fell.*

40.    Plaintiff Voltage Holdings, LLC is a beneficial and actual owner of copyrights in the motion pictures *Ava; A Family Man; Don Jon; Extremely Wicked, Shockingly Evil and Vile; Fathers & Daughters; First Love; Good Kill; I Feel Pretty; I.T.; Lady Bloodfight; Pay the Ghost; Revolt; Status Update; The Cobbler; The Professor and the Madman; The Company You Keep; The Necessary Death of Charlie Countryman;* and *Welcome Home.*

41.    Plaintiff Venice PI, LLC and Plaintiff Voltage Holdings, LLC are beneficial and actual owners of copyrights in the motion picture *Once Upon a Time in Venice.*

42.    Plaintiff Bedeviled LLC is a beneficial and actual owner of copyrights in the motion picture *Bedeviled.*

43.    Plaintiff Colossal Movie Productions, LLC is a beneficial and actual owner of copyrights in the motion picture *Colossal.*

44.    Plaintiff Dallas Buyers Club, LLC is a beneficial and actual owner of copyrights in the motion picture *Dallas Buyers Club.*

45.     Plaintiff YAR Productions, Inc. is a beneficial and actual owner of copyrights in the motion picture *Distorted.*

46.     Plaintiff Wonder One, LLC is a beneficial and actual owner of copyrights in the motion picture *Disturbing the Peace.*

47.     Plaintiff REP PRODUCTIONS 12 LTD is a beneficial and actual owner of copyrights in the motion picture *Elizabeth Harvest.*

48.     Plaintiff Fun Mom Dinner, LLC a beneficial and actual owner of copyrights in the motion picture *Fun Mom Dinner.*

49.     Plaintiff Chase Film Nevada, LLC is a beneficial and actual owner of copyrights in the motion picture *Last Seen Alive.*

50.     Plaintiff H Films, Inc. is a beneficial and actual owner of copyrights in the motion picture *Redemption Day.*

51.     Plaintiff Ammo Entertainment, Inc. is a beneficial and actual owner of copyrights in the motion picture *Room 203.*

52.     Plaintiff SF Film, LLC is a beneficial and actual owner of copyrights in the motion picture *Skin.*

53.     Plaintiff MON, LLC is a beneficial and actual owner of copyrights in the motion pictures *Singularity* and *Welcome Home.*

54.     Plaintiff Goldenrod Holdings, LLC is a beneficial and actual owner of copyrights in the motion picture *Ted Bundy: American Boogeyman.*

55.     Plaintiff Rep Productions Scandi LTD is a beneficial and actual owner of copyrights in the motion picture *The Bird Catcher.*

56.     Plaintiff Voltage Pictures, LLC is a beneficial and actual owner of copyrights in the motion picture *The Rest of Us.*

57.     Plaintiff Voltage Pictures, LLC is also a beneficial owner in each of these motion pictures.

58.     Together, these motion pictures are referred to as the "Works." The Works are the subjects of copyright registrations, and this action is brought pursuant to section 411 of the Copyright Act.  17 U.S.C. § 411. The Works are motion pictures currently offered for sale in commerce.

**B.      Third parties directly infringed Plaintiffs' copyrighted works using AT&T's internet services.**

**1.      The BitTorrent process.**

59.     Third parties using AT&T's internet services ("AT&T users") directly infringed Plaintiffs' rights in the Works.  AT&T users engaged BitTorrent technology to reproduce, distribute, publicly perform, and publicly display Plaintiffs' Works without Plaintiffs' permission.

60.     Torrenting is also known as peer-to-peer file sharing.  It operates using a torrenting protocol—a set of rules governing the communication between computers—that allows computers to transfer files directly to many other computers.

61.     BitTorrent is one of the most popular torrent protocols.  BitTorrent joins computers in a "swarm" of host computers that download and upload pieces of a file from each other simultaneously.  As soon as a user has downloaded a piece of the file, he or she starts sharing that piece with others in the swarm, while continuing to download the rest of the file.

62.     BitTorrent thus makes it much quicker for many people to share and download a file, compared to the traditional method of directly downloading a whole file from one computer.

BitTorrent can be used to share any type of file, but many use it to share copyrighted films and recordings without the owner's permission—which is online piracy.

### 2.      Torrent files and torrent sites.

63.     To download a film using BitTorrent technology, a user needs to obtain a torrent file.  A user can find and download a torrent file for pirating a particular movie from a torrent site.  A torrent site is a website that indexes and provides torrent files for download.  Examples of torrent sites are RARBG, 1337x, The Pirate Bay, OxTorrent, and YTS.  The United States Trade Representative has listed YTS and RARBG as examples of online marketplaces that engage in and facilitate substantial piracy.

64.     The user then engages the torrent file with a BitTorrent client, a computer program that implements the BitTorrent protocol.  The BitTorrent client uses information recorded in the torrent file to download a file constituting a digital version of a film, and to distribute the film to other computers in the "swarm" described above.  Once a user has downloaded all pieces of the film, the BitTorrent client verifies the pieces and reassembles them into a fully playable copy of the film.  The user has the film on his or her computer, to keep and use indefinitely.

### 3.      AT&T users reproduced, distributed, publicly displayed, and publicly performed Plaintiffs' Works using BitTorrent.

65.     Publicly-available records from the American Registry for Internet Numbers ("ARIN") identify the IP addresses allocated by AT&T.  ARIN initially allocates IP addresses to AT&T, and AT&T reallocates IP addresses to its subscribers. These AT&T-allocated IP addresses ("AT&T IP addresses") can then be used to access the internet, and transfer and receive files over the internet.  AT&T is required to report the IP reallocation information to

ARIN.  ARIN makes information about the reallocation of IP addresses publicly available on its Whois service.

66.     Plaintiffs engaged data providers such as Maverickeye UG ("Maverickeye") to identify the IP addresses that were used to engage the BitTorrent protocol and pirate copies of Plaintiffs' Works.

67.     Maverickeye used forensic software to enable the scanning of peer-to-peer networks for the presence of infringing transactions.  Maverickeye extracted the resulting data from the investigation, and isolated the transactions and IP addresses associated with the files identified by their hash values.  Maverickeye logged information including the IP addresses, the hash values, and hit dates (access or use dates) that show that users of AT&T's internet services engaged BitTorrent to download and distribute copies of Plaintiffs' Works.  For each of the Works, Maverickeye verified that a full file distributed and downloaded in this process contained a digital copy of a motion picture that is identical (or alternatively, strikingly similar or substantially similar) to one of Plaintiffs' Works.  Maverickeye verified that the IP addresses were allocated by AT&T using publicly-available information from ARIN.

68.     Maverickeye's findings show that AT&T users downloaded pirated copies of Plaintiffs' Works to their computers and then transmitted pieces of Plaintiffs' Works to other computers in a swarm using BitTorrent, so that other computers can download re-assembled and fully-playable copies of Plaintiffs' Works.  These swarms included computers both within the United States and outside of the United States.  These transmissions are distributions of copyright-protected elements of Plaintiffs' Works to others.

69.     These transmissions are also performances and displays of the Works to the public.  The transmissions are received by a significant number of other computers in the

BitTorrent swarm, and users at these other computers play the pirated motion pictures at separate places and at separate times. These other users constitute members of the "public" because they are outside of the normal circle of a family and its social acquaintances.

70. These acts also constitute reproducing Plaintiffs' Works. When an AT&T user finishes downloading all the pieces of a copied Work through the BitTorrent process, the BitTorrent client reassembles the pieces into a full, playable copy of a Work on the user's computer, thereby reproducing the Work.

71. Maverickeye's investigations show that AT&T users infringed Plaintiffs' Works in the manner described above hundreds of thousands of times in the past three years. Each instance of infringement used internet service (including connection and transmission services) and IP addresses provided by and controlled by AT&T.

72. For example, on March 26, 2022, an AT&T user downloaded and distributed a copy of the Work *After We Collided*, under the file name "After We Collided (2020) [1080p] [WEBRip] [YTS.MX]," using AT&T internet services and the AT&T IP address 99.96.68.104.

73. For example, on November 30, 2021, an AT&T user downloaded and distributed a copy of the Work *After We Collided*, under the file name "After We Collided (2020) [1080p] [WEBRip] [YTS.MX]," using AT&T internet services and the AT&T IP address 99.96.68.104.

**C.     AT&T knowingly materially contributed to its users' copyright infringements.**

      **1.     AT&T knew, had reason to know, or was willfully blind to, its users' direct infringements of Plaintiff's Works.**

74. Plaintiffs' agents sent notices of infringement ("Notices") to AT&T, for instances in which Maverickeye confirmed infringement of copyright-protected content using AT&T IP addresses.

75.     Each Notice included at least the name of the copyright owner, the title of the Work, the name of infringing file, the IP address and port number where infringement was confirmed, the date and time of infringement, and that the infringement made use of the BitTorrent protocol.

76.     The recipient email address for the Notices was an email address that AT&T provided on its website for notifications of copyright infringement.

77.     And AT&T acknowledged that it received exactly the kind of infringement information contained in the Notices that Plaintiffs' agents sent to AT&T.  As of August 2022, AT&T stated on its website:

> "When files are distributed on the Internet over peer-to-peer networks, the IP address associated with a subscriber's account is visible by design to other users on the network. Content owners and their agents have developed state-of-the-art software that participates in these peer-to-peer networks to identify pirated film, TV and music content that they own and the IP addresses associated with the distribution of that content. Content owners provide these IP addresses to AT&T along with additional information about the content that was allegedly shared by that IP address.  AT&T matches the IP address sent by the content owner to the specific customer to whom that IP address was assigned at that time, and then forwards the information provided by the content owner to that user."

78.     The Notices gave AT&T knowledge of specific instances of third parties' infringements of Plaintiffs' Works using AT&T's internet services.

79.     In the alternative, these Notices gave AT&T reason to know of specific instances of infringements, or alerted AT&T to the high probability that AT&T users infringed Plaintiff's Works, and AT&T deliberately avoided confirming that fact.  If AT&T had any doubt as to the truth of these infringement notices, it could use the information contained in the Notices to investigate and verify the infringements.  For example, AT&T could have obtained the torrent file for downloading a movie, using the infringing file name contained in the Notices, and opened the file in a BitTorrent client to view information about the file, such as the infringing file's unique hash value.  AT&T could use this unique hash value to confirm that the file

contains a copy of one of Plaintiff's Works.  For example, AT&T could have obtained data packets of the traffic from the IP addresses recorded in the Notices and verified that they contain copies of one of Plaintiff's Works.

80.    Plaintiffs' agents sent AT&T thousands of Notices about specific instances of infringements of Plaintiffs' Works using AT&T's internet services.

81.    For example, Plaintiffs' agent sent over 40,000 Notices to Defendant concerning infringement of the movie *I Feel Pretty* using AT&T internet services and AT&T IP addresses.

82.    For example, Plaintiffs' agent sent over 1000 Notices to Defendant concerning infringement of the movie *Dallas Buyers Club* using AT&T internet services and AT&T IP addresses.

83.    For example, Plaintiffs' agent sent over 10,000 Notices to Defendant concerning infringement of the movie *Extremely Wicked, Shockingly Evil and Vile* using AT&T internet services and AT&T IP addresses.

84.    For example, Plaintiffs' agent sent over 26,000 Notices to Defendant concerning infringement of the movie *Once Upon a Time in Venice* using AT&T internet services and AT&T IP addresses.

85.    For example, Plaintiffs' agent sent over 8000 Notices to Defendant concerning infringement of the movie *A Family Man* using AT&T internet services and AT&T IP addresses.

86.    For example, Plaintiffs' agent sent over 800 Notices to Defendant concerning infringement of the movie *After We Collided* using AT&T internet services and AT&T IP addresses.

87.     For example, Plaintiffs' agent sent over 6000 Notices to Defendant concerning infringement of the movie *The Professor and the Madman* using AT&T internet services and AT&T IP addresses.

88.     For example, Plaintiffs' agent sent over 5000 Notices to Defendant concerning infringement of the movie *Status Update* using AT&T internet services and AT&T IP addresses.

89.     Plaintiffs also made further efforts to notify AT&T infringements of Plaintiffs' Works using AT&T internet services and AT&T IP addresses.  For example, Plaintiffs' agent sent a letter regarding copyright infringements to AT&T's physical addresses in Dallas, Texas and Bedminster, New Jersey.

> **2.      Despite knowledge of specific infringements, AT&T continued to provide infringing accounts with services essential to infringement.**

90.     As alleged above, AT&T knew, had reason to know, or was willfully blind to, copyright infringements using internet service and IP addresses provided by and controlled by AT&T, including knowledge of repeat infringements from AT&T IP addresses.

91.     But AT&T did not take meaningful action to prevent ongoing infringements by these AT&T users.  AT&T failed to terminate the accounts associated with these IP addresses or otherwise take any meaningful action in response to these Notices.  AT&T often failed to even forward the Notices to its internet service customers or otherwise inform them about the Notice or its contents.

92.     Instead, AT&T continued to provide the internet access and services necessary for users to commit further online piracy.  AT&T continued to provide access to the internet from the IP addresses that infringers used to pirate movies.  AT&T also continued to transmit copies of Plaintiffs' Works to a user's computer for infringing reproduction, infringing public performance, and/or infringing public display when a user was downloading a Work.  And

AT&T continued to transmit copies of Plaintiffs' Works from a user's computer to distribute the Work, and for reproduction, public performance, and public display. The provision of these internet services is an essential step in the third-party infringements, and substantially magnifies the underlying infringements.

93.     Maverickeye also investigates infringements of other copyright-protected motion pictures as well as Plaintiffs' Works, and records notices of infringements sent to AT&T regarding those infringements. Maverickeye's records show that AT&T received hundreds of notices about infringements at certain AT&T IP addresses. This evidence further shows that AT&T does not terminate its internet services to repeat infringing accounts. And it shows that AT&T's continued provision of internet services to these accounts substantially magnifies infringing activity at these accounts.

94.     For example, AT&T failed to terminate the account of its subscriber at IP address 104.5.19.25 even after AT&T received multiple notices of copyright infringement at this address. AT&T received at least 1000 notices of copyright infringement for this IP address. Each notice accounted for at least one instance of infringement.

95.     For example, AT&T failed to terminate the account of its subscriber at IP address 99.167.94.126 even after AT&T received multiple notices of copyright infringement at this address. AT&T received at least 900 notices of copyright infringement for this IP address. Each notice accounted for at least one instance of infringement.

96.     For example, AT&T failed to terminate the account of its subscriber at IP address 99.116.100.52 even after AT&T received multiple notices of copyright infringement at this address. AT&T received at least 900 notices of copyright infringement for this IP address. Each notice accounted for at least one instance of infringement.

97.    For example, AT&T failed to terminate the account of its subscriber at IP address 107.134.100.242 even after AT&T received multiple notices of copyright infringement at this address.  AT&T received at least 800 notices of copyright infringement for this IP address.  Each notice accounted for at least one instance of infringement.

98.    For example, AT&T failed to terminate the account of its subscriber at IP address 71.131.45.32 even after AT&T received multiple notices of copyright infringement at this address.  AT&T received at least 800 notices of copyright infringement for this IP address.  Each notice accounted for at least one instance of infringement.

**D.    AT&T vicariously infringed Plaintiff's Works.**

**1.    AT&T had the right and ability to supervise and control third parties' infringements.**

99.    AT&T supervised and controlled the infringing activity of third parties because it had the right and ability to terminate its internet services to a customer's account at any time.

100.    For example, as of August 2022, AT&T stated on its website: "AT&T reserves the right to modify, suspend, or discontinue any function or feature of any AT&T Service, including your rates or charges, or to terminate your AT&T Service entirely, for any reason." For example, AT&T terminates users' accounts due to nonpayment.

101.    AT&T also had the ability to block user access to certain sites.  For example, AT&T stated that it "[u]pon receipt of appropriate written notification from the complaining party, as described above, AT&T will remove or disable access to the material that is claimed to be infringing."

102.    Termination of internet services to infringing accounts would stop infringing activity at those accounts.  And AT&T's provision of internet services is an essential step in users' copyright infringements at AT&T accounts.  But, as alleged above, AT&T did not

15

terminate internet services to known, infringing accounts.  And AT&T continues to provide internet services to known, infringing accounts.

### 2.    AT&T profits from facilitating online piracy.

103.    By continuing to provide internet services to accounts used for repeat infringement, rather than terminating such accounts, AT&T can continue to receive subscription payments from those accounts.  For example, AT&T currently offers residential internet services in exchange for monthly payments, ranging from $55 per month to $80 per month.  If AT&T terminated the internet account of, or stopped providing internet services to, an existing customer due to copyright infringements at their account, then AT&T could no longer collect monthly payments from that customer.  By not terminating the account, AT&T continues to receive monthly payments from that account for years into the future.  For example, if AT&T fails to terminate a pirate account, and that subscriber continues as an AT&T subscriber for another 5 years at $80 per month, AT&T would earn an additional $4800 in revenue from that subscriber, most of which would be profits for AT&T.

104.    The ability to use AT&T's internet services for pirating is also a draw for AT&T's customers and potential customers.  AT&T's refusal or failure to take action against known copyright infringement is a draw for customers to purchase AT&T's internet services.  AT&T's continued services to customers, after AT&T receives notice that they infringed copyrights using AT&T's service, is similarly a draw for customers to purchase AT&T's services.  As alleged above, certain AT&T users continued to use AT&T's services to infringe copyrights, even after AT&T received hundreds of copyright infringement notices for those customer accounts.

**E.      AT&T does not have a safe harbor from liability.**

105.      In 1988, Congress passed the Digital Millennium Copyright Act (DMCA), which provides protection or a "safe harbor" from liability for service providers.  But the DMCA only protects a service provider if the service provider "has adopted and reasonably implemented… a policy that provides for the termination in appropriate circumstances of subscribers… who are repeat infringers."  17 U.S. C. §512(i)(1)(A).

106.      AT&T claims that it has such a policy, but in fact, at all relevant times, AT&T had neither adopted nor reasonably implemented a policy that provides for the termination of repeat infringers in appropriate circumstances.

**1.      AT&T's published policy did not provide for the termination of repeat infringers under appropriate circumstances.**

107.      AT&T had a DMCA policy published on its website as of August 2022.

108.      But according to AT&T's published policy, AT&T was not required to terminate the accounts of repeat infringers.  For example, AT&T published on its website: "A subscriber's receipt of multiple Copyright Alerts will be a factor used by AT&T in determining whether to terminate their service under the AT&T's Repeat Infringer Policy."  This policy only required AT&T to consider information about repeat infringements in determining whether to terminate a customer's account.  This policy does not require AT&T to terminate repeat infringers.

**2.      AT&T did not reasonably implement a policy that provided for the termination of repeat infringers under appropriate circumstances.**

109.      AT&T did not reasonably implement a policy that provided for the termination of repeat infringers under appropriate circumstances.  AT&T's implementation of its policy made it more difficult for copyright holders to notify AT&T of infringements, and made it unlikely that the accounts of repeat infringers would be terminated.  For example, AT&T stated on its website that it will not accept information about certain infringements—such as infringements using

17

peer-to-peer file sharing technology—sent to its Registered Copyright Agent "due to the substantial volume of notifications of claimed infringement that AT&T receives and processes." AT&T provided a form for copyright holders to send notifications of copyright infringement using peer-to-peer file sharing technology, but the form contained eleven mandatory fields, making it unduly burdensome for copyright holders to notify AT&T of mass piracy.

110.   AT&T did not terminate customer accounts even if it received information about a high number of repeat infringements at those customer accounts.  As alleged above, AT&T has allowed hundreds of infringements to occur at certain accounts, despite receiving at least as many notices of infringement regarding those accounts.  And AT&T users have reported receiving multiple infringement notices from AT&T without having their accounts terminated.

   **F.   AT&T users distributed copies of Plaintiffs' Works with false or altered copyright management information.**

111.   Section 1202 of the DMCA prohibits the distribution of false copyright management information with intent to induce, facilitate, or enable copyright infringement.  17 U.S.C. §1202(a).  Section 1202 also prohibits a user's distribution of altered copyright management information, and a user's distribution or public performance of works or copied works with altered copyright management information, if the user knows or has reason to know that these acts would induce, facilitate, or enable copyright infringement.  17 U.S.C. §1202(b).  By using BitTorrent to pirate movies, AT&T users committed DMCA violations.

   **1.   The distributed files contained false or altered copyright management information.**

112.   As alleged above, AT&T users engaged BitTorrent technology to distribute and download copies of Plaintiffs' Works.  The name of a file distributed and downloaded in this manner is copyright management information, because it is information conveyed in connection

with copies of a work, or performances or displays of a work, in digital form, including the title and other information identifying the work.  But many of the distributed files include false or altered copyright management information.  Many of the file names were modified or altered to include information in a format that is customary for pirating movies, such as the name or Uniform Resource Locater ("URL") of a torrent site, or a label indicating the method of copying the movie, such as "WEBRip."  For example, the file name of a pirated copy of Plaintiffs' Work distributed through BitTorrent technology was: "After We Collided (2020) [1080p] [WEBRip] [YTS.MX]."  This file name includes the title and release date identifying a copy of the Work *After We Collided*.  It also includes the URL of a torrent site, "YTS.MX."  And it includes a label indicating the method by which the movie was copied, "WEBRip."

113.   This information is false or altered copyright management information because the copyright management information of a legitimate file of Plaintiffs' Works does not contain the name or URL of a torrent site, and does not contain a label indicating the method of copying the movie file.  And such information does not convey information about the true author, producer, licensor, or distributor of the Work.  Instead, such information refers to the illegal pirating of the Work.  Therefore, the information is either false information about the legitimate, copyrighted Work, or else an alteration of the copyright management information of the legitimate, copyrighted Work.

### 2.    AT&T users knew, had reason to know, or were willfully blind to the fact, that the copyright management information was false or altered.

114.    AT&T users knew, had reason to know, or were willfully blind to the fact, that file names containing the name or URL of torrent sites, or a label indicating the method of copying a movie, were false or altered copyright management information.

115.    When users engaged in online piracy using BitTorrent, they knew that torrent sites are used for pirating, and that the films obtained through this process are infringing copies. These users are, by definition, online users obtaining films from internet sources.  A search of any of Plaintiffs' Works in a search engine for sites that allow renting or buying a film would produce sites such as on Amazon Prime Video, Apple iTunes, or Google Play, all of which post prices for renting or buying the film.  The users knew that obtaining a legal copy of a film requires payment (either directly if acquiring a single film, or indirectly, by subscribing to a service such as Netflix).  By contrast, obtaining a film using BitTorrent technology requires actively looking for a torrent site with pirated movies, looking for and obtaining a torrent file to pirate a particular movie, and engaging the torrent file with a BitTorrent client to download the film for no payment.  All of the infringing AT&T users obtained the films using torrent sites, torrent files, and BitTorrent technology, at no cost.

116.    Many of the users had even registered an account with a torrent site, like YTS. The YTS website operator maintained records of activity of registered YTS user accounts created from AT&T IP addresses.  The records include the email address of the registered user account, the torrent files that the registered account downloaded, the IP address from which the registered user accessed the YTS website, and the dates of download.  These records show that AT&T users downloaded torrent files for pirating Plaintiffs' Works.  For example, an AT&T user registered an account with the YTS website from the AT&T IP address 107.77.161.18 using the email address karl******er@gmail.com and, on May 6, 2019, downloaded the torrent file for pirating the Work *Dallas Buyers Club*.

117.    As a result, these AT&T users knew, had reason to know, or were willfully blind to the fact, that they were obtaining pirated copies of the films; that a torrent URL like

"YTS.MX" is not the true title, author, producer, or licensed distributor of any of the Works; that a legitimate copy of a Work is not copied or "ripped" from a streaming service, as a label like "WEBRip" indicates; that such information refers to the illegal reproduction and distributing of a Work, or generally to pirating; and therefore that a legitimate file name of a Work does not include the name or URL of a torrent site, and does not include a label indicating the method by which a movie file was copied.

> **3.    AT&T users knew, had reason to know, or were willfully blind to the fact, that their acts would induce, facilitate, or enable copyright infringement.**

118.    As alleged above, these AT&T users knew that, by acquiring films from a torrent site using a BitTorrent client, they were engaged in infringement.

119.    They knew that distributing the false or altered copyright management information, and distributing or publicly performing copied Works with false or altered copyright management information, would induce, facilitate, or enable further pirating. The users knew, had reason to know, or were willfully blind to the fact, that the name or URL of a torrent site would enhance awareness of a torrent site, or enhance the reputation of a torrent site; that the URL of a torrent site may induce, facilitate, or enable further infringements by helping other users to find and access the torrent site to pirate movies; that a label indicating the method by which a movie was copied would facilitate further pirating, by assisting others in choosing a particular torrent file for pirating. Accordingly, AT&T users knew, or had reasonable grounds to know, or were willfully blind to the fact, that their acts would induce, facilitate, or enable copyright infringement.

120.    AT&T users knowingly distributed false or altered copyright management information, and distributed and publicly performed copied Works with false or altered copyright management information, in the manner alleged above, thousands and thousands of times.

21

121.    For example, on March 25, 2022, an AT&T user downloaded and distributed a copy of the Work *After We Collided*, under the file name "After We Collided (2020) [1080p] [WEBRip] [YTS.MX]," using AT&T internet services and the AT&T IP address 99.96.68.104.

122.    "YTS.MX" is the name and URL of a torrent site. "YTS.MX" is not included in the copyright management information of legitimate copies or streams of the Work *After We Collided*.

123.    Adding the names of torrent sites like "YTS.MX" enhances the reputation of the torrent site, creates potential users' awareness of the torrent site, and attracts users to the torrent site. And labels indicating the method of copying, like "WEBRip," facilitate or induce pirating by informing a user of the type of movie copies that are available for torrenting.

### G.    AT&T materially contributed to third parties' use of false or altered copyright management information.

#### 1.    AT&T knew, had reason to know, or was willfully blind to its users' DMCA violations.

124.    As alleged above, Plaintiffs' agents sent Notices to AT&T, for instances in which Maverickeye confirmed infringement of copyright-protected content at AT&T IP addresses. These Notices included at least the name of the copyright owner, the title of the Work, that the work was infringed using BitTorrent, the file name that includes the false or altered copyright management information, the IP address and port number where infringement was confirmed, and the time of infringement.

125.    The Notices gave AT&T knowledge of specific instances of third parties' DMCA violations using AT&T's internet services. In the alternative, the Notices gave AT&T reason to know of specific instances of infringements, or alerted AT&T to the high probability that AT&T users committed DMCA violations, and AT&T deliberately avoided learning that fact. For

example, the Notices showed that users pirated Plaintiffs' Works with file names containing the name or URL of a torrent site.  For example, the Notices showed that users pirated Works with file names containing a label indicating the method by which a movie was copied, such as "WEBRip."  If AT&T had any doubt that users had pirated Works with such file names, then it could have easily investigated to verify that information.  For example, AT&T could have taken the steps alleged above to verify that third parties infringed Plaintiffs' Works from AT&T IP addresses.  And AT&T could compare the infringing file name recorded on the Notices with the copyright management information of a legitimate copy of one of Plaintiff's copyrighted Works, such as in the copyright registration for the film, the credits of the films, or in the file name of a legitimate Blu-ray disc copy of the film.

> **2.    Despite knowledge of these violations, AT&T continued to facilitate the violations.**

126.    Despite knowledge of specific and repeat DMCA violations, AT&T continued to provide internet services to facilitate the violations.  Specifically, AT&T continued to provide access to internet services at IP addresses that committed DMCA violations.  And AT&T continued to provide the transmissions necessary for users to commit DMCA violations while pirating Plaintiffs' Works.  The provision of internet services are an essential step in users' DMCA violations while pirating movies.  And the provision of internet services substantially magnifies users' DMCA violations while pirating movies.  As discussed, AT&T received hundreds of Notices concerning infringements at certain accounts.  And a substantial number of these infringements used file names containing the name or URL of a torrent site, or a label indicating the method by which a movie was copied.

H.     **AT&T vicariously committed DMCA violations.**

    1.     **AT&T had the right and ability to supervise and control third parties'
DMCA violations.**

127.     As alleged above, AT&T can terminate its internet services to a customer's

account at any time.  Termination of internet services to infringing accounts would stop DMCA

violations at those accounts.

    2.     **AT&T profits from third parties' violations.**

128.     If AT&T continues to provide internet services to customer accounts used for

repeat DMCA violations while pirating movies, then AT&T can continue to receive subscription

payments for those accounts.

129.     As alleged above, AT&T offers internet services in exchange for monthly

payments.  If AT&T terminated the internet account of, or stopped providing internet services to,

an existing customer due to repeat DMCA violations at their account, then AT&T could no

longer collect monthly payments from that customer.

130.     The ability to use AT&T's internet service for DMCA violations while pirating is

also a draw for AT&T's customers and potential customers.  AT&T's refusal or failure to take

action against such violations are a draw for customers to purchase AT&T's internet services and

to use those services.

**FIRST CAUSE OF ACTION**
**(contributory copyright infringement)**

131.     Plaintiffs re-allege and incorporate by reference the allegations contained in each

of the foregoing paragraphs.

132.   Plaintiffs are the legal and/or beneficial copyright owners of the Works, including the rights to reproduce, distribute, publicly perform, publicly display, and prepare derivative works of the Works.

133.   Third parties using AT&T's internet services directly infringed Plaintiffs' Works. Specifically, these users infringed Plaintiffs' rights to reproduce, distribute, publicly perform, and publicly display, the Works.  Without Plaintiffs' authorization, these users also imported copies of Plaintiffs' Works into the United States, exported copies of Plaintiffs' Works to outside of the United States, and imported copies of Plaintiffs' Works that have been acquired outside the United States, in violation of section 602.  17 U.S.C. §602(a)(1) and (2).

134.   Defendant materially contributed to these third parties' infringements.  As demonstrated above, Defendant knew (or in the alternative had reason to know or was willfully blind to the fact) that third parties' infringed Plaintiffs' Works using Defendant's internet services.  Despite this knowledge, Defendant facilitated the infringements by continuing to provide the internet access and services necessary for further infringements, and failing to take meaningful steps to minimize or prevent infringements.  Defendant's provision of internet services is an essential step in the third parties' infringements.

135.   Defendant's contributory infringement was a substantial factor in causing Plaintiffs to lose profits and in causing Defendants to earn additional profits.  Defendant's contributory infringement was also a substantial factor in causing numerous violations of the Copyright Act that are eligible for statutory damages.

136.   Defendant's contributory infringements were committed "willfully' within the meaning of section 504(c)(2) of the Copyright Act.  17 U.S.C. §504(c)(2).

## SECOND CAUSE OF ACTION
## (vicarious copyright infringement)

137.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

138.    Plaintiffs are the legal and/or beneficial copyright owners of the Works, including the rights to reproduce, distribute, publicly perform, publicly display, and prepare derivative works of the Works.

139.    Third parties using AT&T's internet services directly infringed Plaintiffs' Works. Specifically, these users infringed Plaintiffs' rights to reproduce, distribute, publicly perform, and publicly display, the Works.

140.    Defendant is vicariously liable for the third parties' infringements.  As demonstrated above, Defendant had the legal right and practical ability to supervise and control the infringements.

141.    And as demonstrated above, Defendant had a direct financial interest in the third-party infringing acts.

142.    Defendant's vicarious contributory infringement was a substantial factor in causing Plaintiffs to lose profits and in causing Defendant's to earn additional profits. Defendant's contributory infringement was also a substantial factor in causing numerous violations of the Copyright Act that are eligible for statutory damages.

## THIRD CAUSE OF ACTION
## (contributory violation of
## the Digital Millennium Copyright Act)

143.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

144.    Third parties using Defendant's internet services knowingly distributed false copyright management information while pirating Plaintiffs' Works.  These third parties did so with the intent to induce, enable, or facilitate copyright infringement.

145.    Third parties using Defendant's internet services distributed or publicly performed Plaintiffs' Works or copies of Plaintiffs Works knowing that copyright management information had been altered without authority of the copyright owner or the law.  These third parties did so knowing or having reasonable grounds to know that their acts will induce, enable, or facilitate copyright infringement.

146.    These acts constitute violations of section 1202 of the Digital Millennium Copyright Act ("DMCA violations").  17 U.S.C.S. §1202(a)-(b).

147.    Defendant materially contributed to the DMCA violations.  As demonstrated above, Defendant knew (or in the alternative had reason to know or was willfully blind to the fact) that third parties were committing these violations using Defendant's internet services. Despite this knowledge, Defendant continued to facilitate the violations by providing internet services to users at these accounts, and failing to take steps to minimize or prevent further violations.  Defendant's provision of internet services is an essential part of third parties' DMCA violations.

148.    Defendant's contributory violations of the DMCA were a substantial factor in causing Plaintiffs to lose profits and in causing Defendant's to earn additional profits. Defendant's contributory violations were also a substantial factor in causing numerous violations of the DMCA that are eligible for statutory damages.

## FOURTH CAUSE OF ACTION
### (vicarious violation of the
### Digital Millennium Copyright Act)

149.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

150.    Third parties using Defendant's internet services knowingly distributed false copyright management information while pirating Plaintiffs' Works.  These third parties did so with the intent to induce, enable, or facilitate copyright infringement.

151.    Third parties using Defendant's internet services distributed or publicly performed Plaintiffs' Works or copies of Plaintiffs Works knowing that copyright management information had been altered without authority of the copyright owner or the law.  These third parties did so knowing or having reasonable grounds to know that their acts will induce, enable, or facilitate copyright infringement.

152.    These acts constitute violations of section 1202 of the Digital Millennium Copyright Act ("DMCA violations").  17 U.S.C.S. §1202(a)-(b).

153.    Defendant is vicariously liable for these DMCA violations.  Defendant had the legal right and practical ability to supervise and control the third parties' DMCA violations.

154.    And Defendant had a direct financial interest in third parties' DMCA violations.

155.    Defendant's vicarious violations of the DMCA were a substantial factor in causing Plaintiffs to lose profits and in causing Defendant's to earn additional profits. Defendant's vicarious violations were also a substantial factor in causing numerous violations of the DMCA eligible for statutory damages.

## PRAYER FOR RELIEF

156.    WHEREFORE, Plaintiffs respectfully request that this Court:

(a)     award Plaintiffs their actual damages from the copyright infringements and Defendant's profits in such amount as may be found; alternatively, at Plaintiff's election, for statutory damages pursuant to 17 U.S.C. §504(a) and (c) against Defendant;

(b)     award Plaintiffs their reasonable attorneys' fees and costs pursuant to 17 U.S.C. §505 and/or 17 U.S.C. §1203(b)((5);

(c)     award Plaintiffs their actual damages from violations of section 1202(a)-(b) of the Digital Millennium Copyright Act and Defendant's profits in such amount as may be found; or, in the alternative, at Plaintiff's election, statutory damages for each violation pursuant to 17 U.S.C. §1203(c);

(d)     order Defendant to adopt and reasonably implement a policy that provides for the termination of internet services to accounts at which there is repeat copyright infringements, under appropriate circumstances;

(e)     order Defendant to block users from accessing notorious piracy websites of foreign origin including those listed in the annual trade report of Notorious Foreign Markets published by the United States Government such as (a) YTS; (b) Piratebay; (c) Rarbg; and (d) 1337x on networks under its control to prevent further pirating of Plaintiffs' Works; and

(f)     grant the Plaintiffs any and all other and further relief that this Court deems just and proper.

**Plaintiffs hereby demand a jury trial on all issues properly triable by jury.**

Dated: September 2, 2022

Respectfully submitted,

By: */s/ Martin Woodward*
                                           Counsel

Martin Woodward (Texas Bar No. 00797693)
Scott Kitner (Texas Bar No. 24065563)
**KITNER WOODWARD PLLC**
13101 Preston Road, Suite 110
Dallas, TX 75240
Tel: 214-443-4300

Greg Dovel* (CA State Bar No. 135387)
Joanne Bui* (CA State Bar No. 340378)
**DOVEL & LUNER, LLP**
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
Tel:  310-656-7066
Email:  greg@dovel.com

- and -

Kerry S. Culpepper* (HI Bar No. 9837)
**CULPEPPER IP, LLC**
75-170 Hualalai Rd., Suite B204
Kailua-Kona, HI 96740
Tel:  808-464-4047

*Counsel for Plaintiff*

**Pro hac vice* admission to be sought